Filed 10/28/20  Estate of Rubin CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| Estate of FLORA RUBIN, Deceased. | B295525 |
| HAYM GANISH, Petitioner and Appellant, v. LOUIS COOPER, Contestant and Respondent. | (Los Angeles County Super. Ct. No. BP157706) |
| LOUIS COOPER, Petitioner and Respondent, v. HAYM GANISH, Objector and Appellant. | (Los Angeles County Super. Ct. No. BP159538) |

APPEAL from orders of the Superior Court of Los Angeles County, Brenda J. Penny, Judge. Affirmed.

Shaw Koepke & Satter and Jens B. Koepke for Contestant and Appellant.

Paul Kujawsky for Petitioner and Respondent.

_____

Appellant Haym "Victor" Ganish appeals from the probate court's orders invalidating certain testamentary instruments executed by Flora Rubin, who died in 2014 at the age of 102. Ganish, 27 years Rubin's junior, met her when she was in her late eighties or early nineties. He eventually moved in with her and they regarded each other as boyfriend and girlfriend. Rubin had macular degeneration and was nearly or completely blind for the last decade of her life.

In 1995, before meeting Ganish, Rubin executed a will and trust distributing her estate to friends, a charity, and family members, including respondent Louis Cooper, her nephew.[1] By 2004 she had amended those documents twice to add additional beneficiaries and adjust the distributions. In 2012, at the age of 100, she executed a new will and an amended and restated trust granting nearly everything to Ganish and his children, and expressly disinheriting Louis.

Louis contested the 2012 instruments, as well as an unsigned instrument purportedly prepared in 2011, and petitioned for probate of the 1995 will. The probate court found

_____

[1] Because Louis Cooper shares a last name with other individuals mentioned in this opinion, we refer to him by his first name. We intend no disrespect.

2

that Ganish had procured the later instruments through undue influence, and ruled in Louis's favor.

On appeal, Ganish contends the probate court failed to apply the correct standard of proof of clear and convincing evidence, instead allowing Louis to prove undue influence by a preponderance of the evidence. We reject this argument. Although the probate court did not state what standard of proof it applied, we must presume the probate court knows the law and applies it correctly in the absence of evidence to the contrary. Also, the record indicates the probate court was aware of the correct standard of review given briefing it requested from the parties on that issue, and the statement of decision reflects a certainty consistent with the clear and convincing standard.

We further conclude that substantial evidence in the record supports the finding of undue influence. Competent evidence supports an inference that, over a period of years, Ganish drove a wedge between Rubin and her extended family and isolated her from trusted caregivers and advisors. At the same time, he exerted control over her medical care and misled her to believe her finances were in disarray, rendering her frightened, confused, and wholly dependent on him. The probate court expressly found this evidence credible, and rejected the testimony in support of Ganish. We must defer to those determinations.

Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

We limit our summary of the facts to those necessary to resolve this appeal. Consistent with the standard of review (see *post*), we present the evidence "in the light most favorable to the prevailing party below." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 (*O.B.*).) We therefore focus our summary on the

3

evidence supporting the judgment, and do not summarize extensively the evidence presented by Ganish in support of his case.  (See *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*) [on substantial evidence review, appellate court disregards evidence contrary to the judgment].)

To the extent any of the evidence summarized here arguably falls within the definition of hearsay, we include it in the absence of an objection at trial.  (*People v. Panah* (2005) 35 Cal.4th 395, 476 [" ' "hearsay . . . , if received without objection takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding" ' "].)

Rubin was born in 1912 and died in 2014 at the age of 102.  Her husband and adult son predeceased her decades earlier.  Rubin had macular degeneration and by approximately 2003 was nearly or completely blind.

Ganish was born in 1939.  According to Ganish, he and Rubin met in 2001.  At some point he began staying overnight in her apartment, and eventually moved in with her.  Rubin sometimes would identify Ganish to people as her "boyfriend," and sometimes as her "caregiver."  Ganish also identified himself alternatively as Rubin's boyfriend or caregiver.

## 1. Rubin's testamentary instruments[2]

### a. Original will and trust

On June 13, 1995, Rubin executed a will and trust. The will disposed of certain jewelry and furs and named as executors her brother Irving Cooper and nephew Louis.[3] Upon her death, the trust was to distribute $300,000 to her nephew Earl Foreman, with smaller distributions to Irving, Louis, and others, with the remainder establishing three named funds at a specified charity. Irving and Louis were named as co-successor trustees.

The trust also distributed to Louis "any promissory note and/or deed of trust executed by Louis Cooper in favor of [Rubin]. . . ." As detailed further *post*, Louis had borrowed $30,000 from Rubin in 1987.

On May 4, 2000, Rubin executed a codicil to her will changing the recipients of her jewelry to Irving, Louis, and Foreman and giving her personal property to Louis and Foreman. Rubin also amended the trust, adjusting the distribution amounts, including increasing the gift to Foreman to $500,000, and adding a number of family members as additional beneficiaries. The amended trust again distributed to Louis his promissory note.

On January 16, 2004, Rubin amended the trust again, keeping the same beneficiaries but adjusting the distribution

---

[2] We paraphrase the testamentary instruments for context only, and our summary of their contents is not binding on any future proceedings concerning these instruments.

[3] As with Louis, we refer to Irving Cooper by his first name.

amounts.  Rather than giving a specific gift to Foreman, the trust now distributed 30 percent of the trust residue to him.  The amended trust again distributed to Louis his promissory note.

### b.    Unexecuted amended trusts

The record contains an unsigned document entitled "The Second Amended and Restated Flora Rubin Trust."  (Some capitalization omitted.)  A later document signed by Rubin states that the second amended and restated trust was dated October 4, 2011, but no executed copy appears in the record.

The purported second amended and restated trust distributed Rubin's personal property to Ganish, except for a fur coat gifted to Foreman.  It granted $400,000 to Foreman and $400,000 to Ganish, with smaller gifts to three family members and a different charity than that specified in the earlier trust documents.  The residue went to Ganish.  The document listed Ganish and Foreman as co-successor trustees.  Louis and most other beneficiaries of the original trust were omitted from the document.

The purported second amended and restated trust referred to an earlier "Amended and Restated Flora Rubin Trus[t] dated August 10, 2010," although that purported document does not appear in the record, executed or unexecuted.

### c.    Third amended and restated trust

On September 13, 2012, when Rubin was 100 years old, she executed "The Third Amended and Restated Flora Rubin Trust." (Some capitalization omitted.)

This trust granted Rubin's fur coat to Foreman and the remainder of her personal property to Ganish.  Foreman's specific gift was reduced to $25,000, with small gifts to two other family

6

members, and no distribution to charity. The remainder went to Ganish, or to two of his children if he did not survive Rubin. Ganish was appointed successor trustee, with his two children co-successor trustees if Ganish did not survive.

The third amended and restated trust expressly "made no provision herein for Louis Cooper. . . ."

On the same date, Rubin executed a new will bequeathing her entire estate to her trust. She appointed Ganish executor, with his two children as alternate executors, and expressly excluded Louis from the will.

On October 23, 2012, Rubin amended the third amended and restated trust to no longer grant her fur coat to Foreman, and instead, distribute all personal property to Ganish.

In a letter dated June 16, 2014, Rubin's attorney enclosed for her review a "proposed Resignation of Trustee" document under which Rubin would resign as trustee and Ganish would become the new trustee in accordance with the third amended and restated trust. The letter stated that Rubin and her attorney previously had discussed the document. The record does not reflect that Rubin signed the document.

## 2.    Challenges to testamentary instruments

Following Rubin's death, Ganish filed a petition for probate of the September 13, 2012 will. Louis filed a contest to that will, and a petition for probate of the June 13, 1995 will and May 4, 2000 codicil. Louis also filed a petition to invalidate the second and third amended and restated trusts and the amendment to the third amended and restated trust. Louis contended that Rubin lacked testamentary capacity and that the challenged instruments were the product of undue influence.

The probate court tried the petitions and contest together.

7

### 3.    Witness testimony

We summarize below the testimony of certain witnesses at trial.

#### a.    Barbara Cooper[4] and Sharleen Blair

Barbara Cooper is Rubin's niece.[5]  She visited Rubin frequently at Rubin's apartment, apart from a four-year period beginning approximately 2009 in which Barbara's son was ill with cancer.  During the period when Barbara did not visit, she continued to contact Rubin by phone.  Barbara said it became more difficult to speak with Rubin on the phone when Ganish was there.

Rubin told Barbara that Ganish did not believe in American medicine and that Rubin was not taking as much medication anymore.  Barbara heard Ganish say on several occasions that " 'American medicine is poison,' " including in front of Rubin.

Although Rubin was hospitalized numerous times during her relationship with Ganish, Ganish never contacted Barbara to let her know.

In 2013, after Barbara's son died, she went to see Rubin after being unable to reach Rubin by phone for months—Ganish

---

**4**  As with Louis, we refer to Barbara Cooper by her first name.

**5**  Rubin added Barbara as a beneficiary to her trust in the May 4, 2000 amendment, initially granting Barbara 10 percent of the trust residue after payment of specific gifts.  Rubin changed the distribution to seven percent of the trust estate in the 2004 amendment.  Barbara remained a beneficiary in the third amended and restated trust with a specific gift of $10,000.

would tell Barbara that Rubin would call her back, but she never did.  Barbara's friend, Sharleen Blair, went with her.  Barbara described Ganish "dragging [Rubin] out from her bedroom" "totally in a stupor."  Ganish sat Rubin on the couch next to Barbara.  Rubin dropped her head onto Barbara's shoulder and drooled.  Barbara described her as "out."

Blair similarly testified that during the visit to Rubin, Ganish "all but carried [Rubin] out," at which point Rubin mumbled, then fell asleep and drooled on Barbara's shoulder.

Blair further testified that during an earlier visit to Rubin's apartment, Blair saw what appeared to be brand new and sealed containers of medication.  Rubin told Blair that Ganish had told her not to take them because they were not good for her, and to take only what Ganish gave her.

Barbara contacted adult protective services about Ganish, but no action was taken on the complaint.

### b.    Cheryl Williams

Williams is Louis's girlfriend.  From 2001 to 2008, she saw Rubin at least once a month, sometimes at Rubin's home and sometimes at Louis's home.  Williams sometimes would read documents such as bank statements to Rubin.

In 2009, Louis was trying to call Rubin as he often did, but had not heard from her in five or six days.  Louis and Williams went to Rubin's apartment to check on her and Ganish answered the door.  Ganish was "hostile" and stood in the doorway.  Louis and Williams slid past him.

Rubin was inside.  Louis and Williams asked Rubin why they had not heard from her.  Ganish spoke to Rubin, telling her, " 'These people are not your family.  These people are not your real family.' "  He continued: " 'These people don't love you.  I am

the only one that loves you, that cares for you.' " Louis reminded Ganish that Louis was the executor of Rubin's estate. Ganish said, " 'Not anymore you're not.' "

Ganish resumed speaking to Rubin, stating that he was the only one who came to see her at the hospital, and that no one loved her but he. Williams responded that Ganish was the only one at the hospital because he had not informed any of the family that Rubin was hospitalized. Williams accused Ganish of not telling anyone to " 'ma[k]e yourself look like a hero" to Rubin.

Ganish continued to repeat that Louis and Williams were not Rubin's family, and that only he loved her. Rubin appeared "dazed." Williams told Rubin that they were there because they were worried about her, and reminded her that Louis had always visited, and taken her out to lunch or shopping, and had arranged with the landlord to repair the windows in Rubin's apartment. Williams said, " 'You know that Lou is your family, you know that, Flora,' " and Rubin said, " 'Yes, that's true.' "

At this, Ganish "got furious" and said to Rubin, " 'You choose between him or me. And I'm going to pack my bags and I'm leaving.' " Ganish left the room. Rubin said, " 'Victor. Victor. Don't get angry. Don't get mad,' " and began feeling her way down the hallway after him. Rubin was "in tears" and "upset." Williams, concerned that Rubin was going to have a heart attack or otherwise get sick, urged Louis to leave. Louis did not want to leave, but relented, and they departed.

Williams said it took her "months to get over what I saw," and she could not bear to visit Rubin again with Ganish there. She did not see Rubin again before Rubin's death.

### c.   Louis Cooper

Prior to 2009, Louis would see Rubin multiple times a month, and would call her at least three times a week.  He would take her to the doctor, out for coffee, or shopping.  He also took her to family parties and to dances for senior citizens.  Around 2004, while Rubin was in the hospital for surgery, Louis arranged to have her apartment repainted and repaired.

In 1987, Louis borrowed $30,000 from Rubin, and executed a note securing the loan.  He paid monthly interest of $275 on the loan until 2009, but never repaid the principal.  In 2009, he asked Rubin to forgive the loan, and he contends she did.[6]

Louis corroborated Williams's account of the 2009 incident at Rubin's apartment in which Ganish told Rubin that Louis did not care about her or love her.  According to Louis, Ganish told Rubin to " 'get [Louis and Williams] out of here or I'm leaving you.' "

Louis contacted the police and the district attorney out of concern for Rubin and her relationship with Ganish, but nothing came of it.  He also asked his sisters to contact adult protective services.

After the confrontation in Rubin's apartment, Louis did not speak with or see Rubin again before she died.

---

[6] Louis claimed Rubin arranged for an attorney to draft a document forgiving the loan.  The document was introduced at trial.  The probate court found "there is contradictory evidence in the record about the significance of the document."  We do not rely on the document in resolving this appeal.

### d. Marlene Waliany

Marlene Waliany worked as Rubin's caregiver beginning in 2008. She shopped, cleaned, took Rubin to the doctor, made appointments for her, and picked up her medications. Waliany said it was "[l]ike [Rubin] was like my mom." Waliany also would take Rubin to Chase Bank once a week, where Rubin would discuss her finances with a bank employee.

Waliany knew Rubin's extended family. Barbara and Louis would visit, with Louis visiting more often. Rubin enjoyed their visits and was also happy to talk to family members by phone.

Rubin told Waliany that Ganish said nobody cared for her except him. Waliany said that she loved Rubin, and Rubin's family loved her too, but Rubin did not listen to her. Waliany heard Ganish say that medicine did not help Rubin, and that the only thing that would help her was fish oil.

At some point, Ganish informed Waliany he did not want her to work for Rubin any more. Waliany called Rubin to tell her, and said that Ganish only wanted Rubin's money. Ganish got on the phone and screamed at Waliany that she was fired.

Ganish nevertheless allowed Waliany to return. After a few months, he decided to care for Rubin himself, at which point "he d[idn't] want [Waliany] to be there [any]more," and her employment ended in January 2012.

### e. Earl Foreman[7]

Foreman is Rubin's nephew, and lives in Chicago. He routinely spoke to Rubin by phone one or more times a week, and

---

[7] Foreman did not appear at trial. Counsel read portions of Foreman's deposition testimony into the record.

estimated he spoke to her at least 50 or 60 times in the last year of her life. Starting around 2011, Ganish would answer the phone for Rubin on weekends, and by 2012, Ganish would always answer the phone. Ganish usually would not put Rubin on the phone, but would say she was sleeping or in the bathroom. Sometimes Foreman would lose his temper and Ganish would put Rubin on the phone. Foreman said Rubin was always happy to talk to him.

Eric Yudis was Rubin's investment counselor and representative at Chase Bank. In 2010, during a meeting at Chase, Rubin put Yudis on the phone with Foreman. Yudis suggested that Foreman start receiving Rubin's financial statements so Foreman could explain them to her. For the next several years, Foreman received Rubin's stock and bond statements on a monthly basis and would discuss them with Rubin on the phone.

On one call, Ganish answered and Foreman heard Rubin screaming in the background, " 'What am I going to do now? Oh, my God. I'm totally broke. I have no money left. What happened to me? What am I going [to] do? How am I going to pay my bills? What's going on?' " Foreman asked to speak with Rubin, and Ganish said, " 'You don't have to talk to her.' " Foreman insisted and Ganish put Rubin, still screaming, on the phone.

Foreman told Rubin he had just received her bond statement, and she still had $967,000 in bonds. He reminded her she had been sending him her statements for two years, and he was not sure why she was having a tantrum. Rubin said, " 'That man's got me all confused. I don't remember [any]thing.' " The record does not specify to whom Rubin was referring.

13

Ganish then got on the phone and asked why Foreman was receiving Rubin's bank statements. Ganish told Foreman to send the statements to him, because he was in charge of the estate and all the bonds. Foreman refused, and told Ganish to stop scaring Rubin. After that conversation, Foreman no longer received Rubin's statements. When he told Rubin this, she told him not to worry about it.

On other occasions, Rubin told Foreman that Ganish had fired various caregivers because they were stealing food and charging too much. She also said that Ganish had stopped her from taking her medication because he thought it was harming her. Ganish told Foreman he believed Rubin's doctors were poisoning her, and that her health had improved because she had stopped taking medication. Ganish did not inform Foreman of Rubin's various hospitalizations.

### f.    Victor Ganish

Ganish testified that he and Rubin "were like husband and wife," and he "gave her a promise ring" to indicate he "would never leave for the rest of [his] life."

Ganish acknowledged firing at least one caregiver, although he said Waliany quit. By 2013 Rubin no longer had caregivers other than Ganish. Ganish acknowledged that Rubin loved Waliany, and Waliany loved her.

Ganish said he was not Rubin's financial advisor and was not interested in her financial affairs. He would help when she asked, however, and by 2010 was helping with her finances.

Louis's counsel played a recording of a call with Transamerica, where Rubin had investments. At one point Rubin put Ganish on the phone and he explained to the Transamerica representative that Rubin had "lost all her money"

14

and had nothing left besides the funds in Transamerica.  When Louis's counsel inquired about this assertion, Ganish first claimed he meant only that if Rubin did not obtain money from Transamerica to close escrow on a house, she would lose a $21,000 deposit.  Pressed further, Ganish explained at length about money Rubin purportedly had lost, listing amounts and financial institutions.

Ganish accompanied Rubin monthly to see Yudis, her representative at Chase Bank.  Ganish did not think Yudis was honest.  Additional recordings of telephone calls with Transamerica indicated that Ganish assisted Rubin in removing Yudis as the agent of record for her account with Transamerica.  During one call, Rubin told the Transamerica representative that Yudis had forged Rubin's signature to put himself on her account, and she planned to sue him.

Asked why Rubin stopped working with Yudis, Ganish stated that Yudis had been "cut" from Chase Bank and placed under house arrest.  Ganish said Yudis told him this, then changed his testimony and said he did not know where Yudis was, and the other Chase employees just told him Yudis was not there anymore.  Yudis later contacted Rubin and asked her to transfer her accounts to his new bank, U.S. Bank.  Ganish told her not to do so because Yudis was a crook.  Rubin transferred her accounts anyway, but ceased working with Yudis a few months later.  Ganish said this was because she had not received any monthly income after transferring her account.

Regarding Rubin's extended family, Ganish first testified that he did not remember arguing with Louis at Rubin's apartment.  During a later day of testimony, however, Ganish presented his version of the 2009 incident described by Louis and

15

Williams. Ganish testified that Louis was the aggressor, and Rubin had told Louis to leave.

Ganish confirmed that Foreman called Rubin at least weekly.

In 2011, Rubin was hospitalized after falling down. Ganish did not inform any of her relatives. After Rubin had been in the hospital three days, Ganish, against the doctors' advice, took her home without going through normal discharge procedures. Ganish said Rubin was turning blue, and he believed the treatment they were giving her was "killing her." Ganish locked the door to Rubin's hospital room so the nurses could not come in, and removed her IV and catheter himself.

### g.     Richard Skolnick

Skolnick was Rubin's attorney. Except for the 2004 trust amendment, he drafted all the testamentary instruments at issue in this case, including the 1995 trust and the 2012 third amended and restated trust.

Skolnick testified that Ganish was present when he discussed estate matters with Rubin, but it was Rubin, not Ganish, who instructed that she wanted the balance of her estate to go to Ganish in the third amended and restated trust. Ganish never told him what to put in the estate documents.

Skolnick stated that Rubin had told him she was mad at Louis for not paying back money he owed. Skolnick did not recall when Rubin told him this.

Skolnick prepared the proposed document, sent to Flora in 2014, through which Rubin would resign as trustee of her trust and Ganish would take over. Skolnick said the goal of the document was to allow Ganish to "deal more effectively with the various accounts of Flora Rubin." Skolnick initially testified that

16

Rubin had asked him to prepare the document. After Louis's counsel read portions of Skolnick's deposition back to him, Skolnick revised his testimony and stated it was Ganish who had called him. Skolnick further testified it was Skolnick's idea to substitute Ganish as trustee, not Ganish's.

Skolnick also testified that Rubin and Ganish had a very close relationship, and that Ganish was a companion who drove her around, took her to doctors, and helped her with her finances. He stated that he observed this, but later acknowledged that he never actually saw Ganish drive Rubin around or take her to appointments.

Asked about Ganish's children, who were included in the later testamentary documents, Skolnick said, "I got the impression that [Rubin] knew and met them. I don't remember exactly what she said." It was his understanding that she met them and had a relationship with them. In later testimony, he explained that Rubin told him she stayed with Ganish at his home in Orange County once, "and I believe she met [Ganish's children] at that time."

Skolnick stated that Ganish at some point told him there were missing bank accounts or financial assets. "There were many, many, many conversations about that subject." Skolnick did not remember the specifics, such as which accounts were purportedly missing, or when Ganish and Rubin discussed this subject with him. Skolnick would tell them "to contact the bank again and say a few things. I don't remember exactly what I said but it wasn't very helpful."

### 4. Probate court's ruling

Before issuing a final ruling, the probate court requested supplemental briefing on, inter alia, the burden and standard of

proof. Louis submitted a brief stating that "[u]ndue influence must be proven by clear and convincing evidence." Ganish stated the same in his written closing argument, filed before the probate court requested supplemental briefing.

The probate court issued its final ruling in a written statement of decision. The court listed the statutory factors for undue influence under Welfare and Institutions Code section 15610.70, and stated, "For a finding of undue influence to be made by the Court, Louis has the burden to establish undue influence and, if established, the burden shifts to [Ganish] to show that he did not unduly influence [Rubin]. [Ganish] must prove by a preponderance of the evidence that such did not occur."

The probate court concluded that the evidence established Ganish had unduly influenced Rubin. The court stated, "Testimony from multiple witnesses was consistent that, after only a short time of Flora Rubin's family becoming aware of [Ganish], [Ganish] moved in with [Rubin], began isolating her from her extensive family, and eventually began firing her care-givers/care providers—making himself the only person she had to rely on." The court noted evidence that Ganish "even controlled . . . [Rubin's] medicinal regimen" and had "removed [Rubin] from the hospital against doctor's orders." The court continued, "Evidence at trial showed that [Rubin], after knowing [Ganish] for only a short time, and after decades of planning to leave her Estate amongst her large family and charities, suddenly began executing a succession of new Testamentary Documents, each benefitting [Ganish] more and more until virtually all of [Rubin's] Estate was left to [Ganish]."

18

The probate court summarized and expressly found credible the testimony of Waliany, Barbara, Blair, Louis, Williams, and Foreman. It expressly found Ganish's testimony not "credible or forthright," and belied by other evidence such as the recordings of the calls with Transamerica. It further found that attorney Skolnick "had minimal personal knowledge about [Rubin's] family or her private life," and "[h]is testimony was contradictory" and in some cases revised on further examination.

The probate court rejected the notion of a "rift between [Rubin] and her family" or that Rubin was angry at Louis because of his unpaid loan. The court found that, "until [Ganish] isolated [Rubin], there was a continuous and warm relationship between Louis and [Rubin], during the entirety of their lives, including after the loan." The court noted evidence "that [Ganish] actively poisoned the relationship between [Rubin] and her family."

The probate court expressly "ma[de] no findings as to lack of [testamentary] capacity."

The probate court ruled invalid the September 13, 2012 Third Amended and Restated Flora Rubin Trust and accompanying will, and the October 23, 2012 amendment to that trust. The probate court further ruled invalid the Second Amended and Restated Flora Rubin Trust, purportedly dated October 4, 2011. The probate court granted Louis's petition to admit the June 13, 1995 will to probate, and appointed Louis as personal representative.

Ganish timely appealed.

## STANDARD OF REVIEW

" 'In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law

19

de novo,' " and " 'apply a substantial evidence standard of review to the trial court's findings of fact.' " (*Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 162.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.) In deferring to the trier of fact's determinations as to the credibility and weight of the evidence, we disregard evidence contrary to the judgment. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582.)

## DISCUSSION

### A.    Governing law

A person may contest the validity of a testamentary instrument on the basis that it was a product of undue influence. (See *Rice v. Clark* (2002) 28 Cal.4th 89, 96 (*Rice*).) Under the common law, "[u]ndue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Ibid.*)

The Legislature has provided a statutory definition of undue influence in the Welfare and Institutions Code: "[E]xcessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and

20

results in inequity." (Welf. & Inst. Code, § 15610.70, subd. (a).)[8] This statutory definition applies under the Probate Code as well, where it is intended to "supplement the common law meaning of undue influence without superseding or interfering with the operation of that law." (Prob. Code, § 86.)

The party contesting a testamentary instrument bears the burden of proving undue influence by clear and convincing evidence. (*Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545.)[9] A party may prove undue influence based on circumstantial evidence, and need not show "direct evidence of undue influence at the moment [a] decedent signed the trust instruments." (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1355 (*Lintz*).)

## B. Ganish fails to show the probate court misapplied the standard of proof

Ganish contends the probate court failed to apply the heightened standard of proof of clear and convincing evidence, instead deciding the case under the standard of preponderance of evidence. Ganish's argument appears to be premised on the fact

---

[8] Unspecified statutory citations are to the Welfare and Institutions Code.

[9] Circumstances may give rise to a *presumption* of undue influence, for example upon a showing that the beneficiary had a confidential relationship with the testator, actively participated in the procuring of the testamentary instrument, and unduly benefitted under the instrument. (*Rice*, *supra*, 28 Cal.4th at pp. 96–97.) The probate court did not rely on a presumption to resolve the instant case, as Ganish acknowledges, and thus the burden was on Louis to prove undue influence by clear and convincing evidence.

21

that the probate court never expressly stated it was applying the heightened standard.  We reject this argument.

It is true that the probate court never expressly stated what standard of proof applied to Louis's showing of undue influence.  Rather, it stated, "For a finding of undue influence to be made by the Court, Louis has the burden to establish undue influence and, if established, the burden shifts to [Ganish] to show that he did not unduly influence [Rubin].  [Ganish] must prove by a preponderance of the evidence that such did not occur."

Ganish fails to identify any authority that it is reversible error for a probate court not to state expressly the standard of proof in its written decision.   "We presume the trial court knew and properly applied the law absent evidence to the contrary." (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103.)  That presumption is particularly appropriate here, where the probate court specifically requested briefing on the standard of proof, and both parties agreed the proper standard was clear and convincing evidence.  There is no reason to believe the probate court misapplied the standard of proof merely because it did not state the standard in its written decision.

Nor can we conclude that, in stating that Ganish's standard of proof was preponderance of the evidence, the probate court applied that standard to Louis as well.  Indeed, the fact that the probate court specifically and separately noted Ganish's standard of proof suggests that it was *not* applying that standard to Louis.

Further reinforcing our conclusion is the statement of decision itself, which makes clear the probate court found the evidence overwhelmingly favored Louis.  The probate court

devoted approximately four single-spaced pages to summarizing the evidence upon which it relied, stating repeatedly how credible it found Louis's witnesses and how not credible it found Ganish's testimony.  The decision leaves little doubt that the probate court was thoroughly convinced that Ganish unduly influenced Rubin.

Ganish's cited authorities are inapposite.  *Estate of Trikha* (2013) 219 Cal.App.4th 791 reversed a probate court's ruling that the appellant had failed to rebut a statutory presumption that his father had revoked his will by destroying it.  (*Id.* at pp. 793–794.)  In concluding the appellant had failed to rebut the presumption, the probate court stated expressly in its written decision that it " 'weighed the evidence and credibility of the witnesses.' "  (*Id.* at p. 807.)  The Court of Appeal held this was error, because the law required that the appellant only provide substantial evidence to rebut the presumption, and " '[t]he substantial evidence test does not ask what proposed facts are more likely than not to be the true facts.' "  (*Ibid.*)  Thus, the probate court incorrectly "evaluated whether [the appellant's] evidence *persuaded* it that [the father] did not destroy his will, rather than focusing on whether his evidence constituted substantial evidence negating the revocation presumption."  (*Ibid.*)

*Estate of Trikha*, which involved a legal error apparent on the face of the probate court's written decision, has no application here, where the written decision gives no indication of any legal error.

In *Lintz*, *supra*, 222 Cal.App.4th 1346, the appellate court concluded the probate court erroneously failed to apply a presumption of undue influence based on the parties' relationship as spouses, because there was "no indication in the record . . . that the probate court applied the presumption."  (*Id.* at p. 1353.)

23

In the instant case, in contrast, the probate court's statement of decision gives us no reason to think it applied the wrong standard.

*Estate of Truckenmiller* (1979) 97 Cal.App.3d 326 stated that undue influence must be proven by clear and convincing evidence, and "[u]ndue influence will not be inferred from 'slight evidence.' " (*Id.* at p. 334.) Again, the statement of decision in the instant case provides extensive explanation of the probate court's ruling, including the evidence upon which it relied. The probate court did not infer undue influence from " 'slight evidence.' "

## C.    There is substantial evidence of undue influence

Ganish claims there was insufficient evidence to support a finding of undue influence. We disagree.

The Welfare and Institutions Code provides a list of factors that "shall be considered" "[i]n determining whether a result was produced by undue influence." (§ 15610.70, subd. (a).) These factors are incorporated into the Probate Code. (Prob. Code, § 86.)

First, "The vulnerability of the victim. Evidence of vulnerability may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability." (§ 15610.70, subd. (a)(1).)

Second, "The influencer's apparent authority. Evidence of apparent authority may include, but is not limited to, status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification." (§ 15610.70, subd. (a)(2).)

24

Third, "The actions or tactics used by the influencer. Evidence of actions or tactics used may include, but is not limited to, all of the following:  [¶]  (A) Controlling necessaries of life, medication, the victim's interactions with others, access to information, or sleep.  [¶]  (B) Use of affection, intimidation, or coercion.  [¶]  (C) Initiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes."  (§ 15610.70, subd. (a)(3).)

Finally, "The equity of the result.  Evidence of the equity of the result may include, but is not limited to, the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, the relationship of the value conveyed to the value of any services or consideration received, or the appropriateness of the change in light of the length and nature of the relationship."  (§ 15610.70, subd. (a)(4).) "Evidence of an inequitable result, without more, is not sufficient to prove undue influence."  (*Id.*, subd. (b).)

Based on these factors, we conclude the record "contains substantial evidence from which a reasonable fact finder could have found it highly probable that" Rubin's later testamentary instruments were the product of undue influence.  (*O.B.*, *supra*, 9 Cal.5th at p. 1011.)  We discuss each factor in turn.

### 1.    Vulnerability of the victim

At the time Rubin executed the challenged testamentary documents, she met many of the indicia of vulnerability under section 15610.70, subdivision (a)(1).  She was elderly—100 years when she executed the third amended and restated trust—and disabled, being completely blind.

25

Rubin also suffered from illness, having been hospitalized multiple times in the preceding years, and was dependent on caregivers and others for her needs. Barbara and Blair testified that during a visit with her she was incoherent and Ganish had to carry her from the bedroom.

Ganish argues evidence in the record indicates that Rubin was "independent, stubborn and strong-willed," and there was no indication of "diminished mental capacity." Assuming arguendo Ganish accurately characterizes this evidence, the probate court found it either not credible or outweighed by evidence supporting a finding that Rubin was vulnerable. Under the applicable standard of review, we must defer to that finding. (*Schmidt*, *supra*, 44 Cal.App.5th at pp. 581–582 [on substantial evidence review, appellate court defers to trial court's credibility findings and does not reweigh evidence].)

### 2. Influencer's apparent authority

Section 15610.70, subdivision (a)(2), lists as examples of those with "apparent authority" both a "care provider" and a "family member." Rubin and Ganish referred to Ganish as her "caregiver," and by Ganish's own admission in the last few years of Rubin's life he was her sole caregiver, the other caregivers having left or been fired. Although Ganish argues he was not a family member, his testimony that they were "like husband and wife" belies this claim. Ganish concedes that he "had an opportunity to control her testamentary actions."

### 3. Influencer's actions or tactics

Ganish's "actions or tactics" in regard to Rubin provided substantial evidence of undue influence. (§ 15610.70, subd. (a)(3).)

26

### i. Control

There was substantial evidence that Ganish was "[c]ontrolling [Rubin's] necessaries of life, medication, [her] interactions with others, [and] access to information." (§ 15610.70, subd. (a)(3)(A).) The evidence showed that Ganish gradually eliminated from Rubin's life those she had previously relied on for affection or assistance, thus making her ever more dependent on him. Multiple family members testified that Ganish made it difficult for them to contact Rubin, and that he never informed them when she was in the hospital, thus leading her to believe Ganish cared for her more than her family. Williams and Louis testified that Ganish threatened to leave Rubin if she did not choose him over her family members. Ganish objected to Foreman helping Rubin with her finances and claimed that Ganish was in charge of Rubin's estate and bonds, after which Rubin no longer sent her financial statements to Foreman. Ganish also got rid of Rubin's caregivers, although he testified that Rubin loved her caregiver Waliany, and Waliany loved Rubin. Ganish pressured Rubin to end her relationship with her financial advisor Yudis, calling him a "crook."

The evidence also showed Ganish was controlling Rubin's medical care. Multiple witnesses testified that Ganish discouraged Rubin from taking prescribed medication, and instead directed her to use supplements provided by him. By his own admission, he took her from the hospital against doctor's orders. In doing so, he locked the door to prevent medical personnel from interfering as he personally removed her IV and catheter.

The probate court could infer from the evidence that Ganish was misleading Rubin about her financial situation.

27

Foreman testified that Rubin was in a panic believing, incorrectly, she had no money left, and Ganish told a Transamerica representative, with Rubin present, that Rubin had lost money. Skolnick testified that he had many conversations with Ganish and Rubin about purportedly missing money. The probate court reasonably could infer Ganish misled Rubin in order to make her fearful and further dependent on him, including in regard to financial matters.

Ganish challenges the conclusion that he separated Rubin from her family, noting that she continued to have contact with family members after she met Ganish, and that it was Louis that decided not to continue seeing her, not Rubin. This disregards the evidence from multiple family members that Ganish repeatedly interfered with their ability to reach Rubin, that he failed to inform them when she was hospitalized, and that he forced her to choose between him and Louis.

Ganish argues that evidence showed Rubin's health flourished under his care, and that he only took her from the hospital out of concern that she had been overmedicated and was in danger of dying if she remained. The probate court found Ganish's testimony not credible, a determination to which we must defer. Ganish claims there was no evidence he prevented Rubin from taking her prescribed medication, but Barbara, Blair, and Foreman all testified that Rubin and/or Ganish had told them she had either stopped or Ganish had told her to stop taking medication. Multiple witnesses also testified that Ganish or Rubin told them of Ganish's strong aversion to Western medicine, calling it "poison."

Ganish notes that Rubin remained with her financial advisor Yudis for some time over Ganish's objection, and that

there was no evidence that Ganish ever took money from Rubin or acted improperly in regard to her financial accounts. He suggests this evidence establishes that he did not unduly interfere in her financial decisions. Although Rubin apparently resisted Ganish's entreaties to rid herself of Yudis for a time, it is undisputed she parted ways with Yudis years before she died. Further, the fact that Ganish had the patience to wait for Rubin to die before availing himself of her finances does not obviate the possibility of undue influence. The evidence cited by Ganish does not undercut the probate court's ruling.

### ii. Use of affection, intimidation, or coercion

The evidence showed Ganish used "affection, intimidation, or coercion" to manipulate Rubin. (§ 15610.70, subd. (a)(3)(B).) Ganish, as Rubin's boyfriend, offered affection, then threatened to withdraw it and leave her if she did not choose him over her family, as testified to by Williams and Louis.

### iii. Initiation of changes in personal or property rights

There is little direct evidence that Ganish initiated any of the changes Rubin made to her estate plan. (See § 15610.70, subd. (a)(3).) Rubin's attorney Skolnick testified that Ganish was present during Skolnick's discussions with Rubin, but that any changes to the estate plan came from Rubin herself. Skolnick testified the 2014 proposed change of trustee arose after Ganish contacted Skolnick, although Skolnick testified the change was his idea, not Ganish's.

Given, however, the evidence set forth above of Ganish's near-total control over Rubin's life, the probate court reasonably could infer that Rubin was not making decisions without heavy

input from Ganish, and that it is highly unlikely she initiated on her own the dramatic changes to her estate plan in her last few years of life. This is reinforced by the fact that Ganish was present when Rubin and Skolnick modified the estate documents, and that at least one proposed change arose from a conversation between Ganish and Skolnick.

As for Skolnick's view that Rubin made her estate choices freely, the probate court found Skolnick lacked personal knowledge of Ganish's and Rubin's relationship, and did not find Skolnick's testimony persuasive. Again, we must defer to that determination.

### 4. Equity of the result

As for the equity resulting from the changes to Rubin's estate plan, we focus on the "divergence from the victim's prior intent or course of conduct or dealing." (§ 15610.70, subd. (a)(4).) Rubin's testamentary documents executed between 1995 and 2004 made significant distributions to friends and family, particularly Foreman, with very specific gifts to charity. The third amended and restated trust, executed in 2012 when Rubin was 100 years old, changed all this, giving virtually everything to Ganish except for greatly reduced gifts to Foreman and two other beneficiaries. Rubin's charitable gift was completely eliminated, and she specifically disinherited Louis, who previously had been entitled to a significant share of her estate as well as the return of his promissory note. Rubin also favored Ganish's children over her own family, appointing them as successor beneficiaries to Ganish, as well as successor trustees and executors.

There is nothing per se suspect about a person gifting substantial assets to a romantic partner met later in life, in the absence of other indicia of undue influence. Here, however,

Rubin's almost total shift away from her previous intent toward a plan that greatly benefitted Ganish and his family, at the expense of Rubin's own family, supports an inference of undue influence, especially in light of the other factors under section 15610.70 discussed above.

Ganish in his appellate briefing focuses on Louis, particularly the evidence that Louis had no contact with Rubin after 2009, and that Rubin was upset with Louis for not paying back the loan. Ganish argues this evidence shows that he, and not Louis, was the proper recipient of Rubin's bounty.

The probate court found the evidence of Rubin's anger with Louis not credible and/or outweighed by the evidence of Louis's longstanding and warm relationship with Rubin prior to 2009. We note that Louis testified he had paid Rubin $275 in interest monthly from 1987 to 2009, and therefore had given her far more than the $30,000 balance on the loan. Further, up until the third amended and restated trust, Flora had always intended to forgive the loan upon her death, which is inconsistent with her being angry about the unpaid loan.

As for Louis's lack of contact with Rubin after 2009, the probate court reasonably could infer this was because of Ganish's efforts to drive a wedge between them. Even assuming Rubin was upset with Louis for breaking ties with her, that anger would be a result of Ganish's undue influence, and not something from which he should be allowed to benefit.

Regardless, Rubin's feelings toward Louis do not explain her apparent change of heart toward Foreman, who kept in touch with Rubin on a weekly basis including in her last years of life, or the other family members she cut out of the third amended and restated trust. The record amply supports the conclusion that,

31

before and even after Ganish came into the picture, Rubin had frequent and happy interactions with her extended family, and there is no reason to think she would so dramatically cut them out of her estate planning absent coercion from Ganish.

As a general argument against the probate court's undue influence finding, Ganish contends the probate court "did *not* find that [Ganish] exerted undue influence over [Rubin's] act of executing the 2012 testamentary amendments or that he somehow overcame her substantial and stubborn free will and substituted his own will for hers." Rather, "[t]he closest the Court came was to say that 'after knowing Victor for only a short time,' [Rubin] 'suddenly began' changing her estate plan to benefit [Ganish]." Ganish notes that the 2004 changes occurred after he met Rubin, and did not benefit him at all, and the later changes that did benefit him arose after they had known each other for a decade.

We disagree with Ganish's characterization of the statement of decision. The thrust of the ruling is that the probate court found that Ganish had methodically dominated Rubin's life by separating her from family, caregivers, and advisors and taking over her medical and other affairs. Viewed through that lens, the dramatic changes to Rubin's testamentary instruments in her extremely advanced years strongly indicate undue influence. The statement of decision is clear on that point.

The fact that Ganish and Rubin were together for some years before she executed the instruments in his favor only reinforces the point, because it establishes that he had time to insinuate himself into her life and slowly take it over.

32

### 5. Ganish's cited cases are distinguishable

Ganish cites several cases in which courts reversed findings of undue influence for lack of substantial evidence.  As we explain, these cases do not contain facts analogous to those in the instant case, and are inapposite.[10]

In *Estate of Llewellyn* (1948) 83 Cal.App.2d 534 (*Llewellyn*), the decedent in 1945 executed a new will in favor of his brother while in the hospital after his brother had visited him "two or three times a day" and assisted him in procuring an attorney and witnesses.  (*Id.* at pp. 540–541, 558.)  The will was "entirely inconsistent" with two earlier wills executed by the decedent. (*Id.* at p. 545.)  The contestants to the will, the decedent's niece and nephew, argued that prior to 1942 the brother had little interest in the decedent, but after their sister died "he then became a frequent visitor to [the decedent] and commenced a systematic campaign to unduly influence the latter . . . ." (*Id.* at p. 563.)

The Court of Appeal concluded that the evidence "amounted to no more than a showing that [the brother] was so situated as to have an opportunity to unduly influence the mind of the testator and at the most, that the actions of [the brother] might be described as suspicious."  The court concluded "such evidence is entirely insufficient to support the finding of the jury." (*Llewellyn*, *supra*, 83 Cal.App.2d at p. 564.)  "Before a testamentary document will be overthrown because of the exercise of undue influence, the proven circumstances must be

---

[10] The cases cited by Ganish are factually dense.  We focus on those facts Ganish identifies as pertinent to the instant appeal, and do not purport to summarize the cases in full.

inconsistent with voluntary action on the part of the testator." (*Id.* at p. 566.)

Estate of Welch (1954) 43 Cal.2d 173 (*Welch*) concerned a challenge to a will executed by decedent Myrtle in favor of her brother Arthur.  Arthur had convinced Myrtle to let him move in with her after Myrtle's husband died, over the fierce objections of their sister Geraldine.  (*Id.* at pp. 176–177.)  A few weeks later, Arthur and Myrtle executed wills together, each leaving the entirety of their property to the other.  (*Id.* at p. 177.) Subsequently there were disputes with relatives over living arrangements of Arthur and Myrtle, and "Arthur systematically excluded Geraldine and her sons from the house."  (*Ibid.*)  There was also evidence that, in the weeks before Myrtle died, more than four years after she executed the contested will, Arthur did not care for her well or arrange a proper burial.  (*Ibid.*)

The Supreme Court reversed the jury's finding of undue influence for lack of sufficient evidence.  (*Welch*, *supra*, 43 Cal.2d at p. 180.)  Among other things, the court noted that "Myrtle's mental and physical condition was not shown to have been such as to permit a subversion of her freedom of will or to negate her independent management of her own affairs.  On the contrary, so far as appears from the record, Myrtle was at all times a clear thinking, deliberate woman, aware of her property holdings and financial situation, and it was not until a few days before her death that her general condition deteriorated."  (*Id.* at p. 178.)

In *Estate of Wright* (1963) 219 Cal.App.2d 164 (*Wright*), the Court of Appeal held that the probate court erred in applying a presumption of undue influence based on the beneficiary's confidential relationship with the decedent.  (*Id.* at p. 169.)  The holding rested largely on the absence of evidence that the

34

beneficiary participated in preparing the contested codicil, a necessary element of the presumption. (*Id.* at pp. 169–170.) That the beneficiary transmitted the decedent's instructions to the attorney and was present when the decedent executed the codicil were insufficient to establish the necessary active participation. (*Id.* at p. 170.) The court further held that the fact that the codicil preferenced the beneficiary, a friend of the decedent, over the decedent's blood relatives did not establish that the codicil's provisions were "unnatural" such that the beneficiary unduly profited thereby. (*Id.* at pp. 170–171.)

*Estate of Mann* (1986) 184 Cal.App.3d 593 similarly held the evidence did not support a presumption of undue influence based on a confidential relationship between the beneficiary and decedent. (*Id.* at pp. 606–609.) The fact that the will preferenced one nephew over another did not render it unnatural. (*Id.* at pp. 606–607.) Even if it did, the evidence that the beneficiary "urged [the decedent] to make a will 'if she was so inclined,' took her to an attorney for this purpose, and was present at the execution of the will" was insufficient to show the beneficiary "actively procured execution of the will." (*Id.* at pp. 607–608.)

None of these cases presents facts similar to those of the instant case, namely a beneficiary who over a period of years used deception and the threat of withdrawal of affection to control an extremely elderly and blind woman and isolate her from those who had cared for her, thus making her fully dependent on and devoted to him. Whatever evidence of undue influence was lacking in Ganish's cited cases is fully present here.

*Wright* and *Mann* are additionally inapposite in that both concern a presumption of undue influence arising from a confidential relationship. As Ganish concedes, the probate court

35

in the instant case did not rely on that presumption, and instead placed the burden on Louis to prove his case.

## DISPOSITION

The orders are affirmed.  Louis Cooper is awarded his costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.